In the Matter of Lloyd **GRASS**, a patient at St. Louis State Hospital, pertaining to Application for Conditional Release Under Section 552.040, R.S.Mo., Applicant/Respondent,

v.

Jeremiah W. (Jay) **NIXON**, Attorney General, and Michael S. Wright, Warren County Prosecuting Attorney, Appellants.

No. 69698.

Missouri Court of Appeals, Eastern District, Division Two.

May 7, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 17, 1996.

Application to Transfer Denied Aug. 20, 1996.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jane Rackers, Asst. Atty. Gen., Jefferson City, Erwin Oliver Switzer, Vicki Little, Asst. Attys. Gen., St. Louis, Michael S. Wright, Pros. Atty., Warren County, Warrenton, for appellants.

C. John Pleban, George A. Kiser, St. Louis, for respondent.

DOWD, Judge.

The State [1] appeals the circuit court's order granting Lloyd Grass conditional release from the custody and control of the Missouri Director of Mental Health. We reverse.[2]

On October 14, 1992, Grass stabbed his wife to death. He was immediately arrested and held in the Warren County jail facilities with occasional trips to Fulton State Hospital for mental evaluations. On September 6, 1994, Grass was found not guilty by reason of insanity for the murder of his wife pursuant to § 552.030.2, RSMo 1994. The court ordered him delivered to the Missouri Director of Mental Health where he was placed in Fulton State Hospital. On March 16, 1995,

---

1. Missouri Attorney General Jeremiah W. Nixon and Warren County Prosecutor Michael S. Wright intervened to oppose the requested conditional release. The Attorney General was directed by the Governor to assist in this case pursuant to § 27.030, RSMo 1994. As a matter of convenience, we shall refer to these intervenors as the State.

2. Grass filed motion to dismiss a subsection of the State's first argument. We deny this motion.

he was transferred to the less restrictive St. Louis State Hospital. On September 12, 1995, Grass was transferred within St. Louis State Hospital to an open ward. The open ward did not lock its residents into their rooms. Grass had his own office so that he could consult and counsel other patients. Grass was allowed to leave the facility under hospital escort to go to his attorney's office and to the theater.

On October 30, 1995, Grass filed a petition with the probate division of the Circuit Court of the City of St. Louis seeking a conditional release pursuant to § 552.040.9, RSMo 1994. Grass requested a series of passes incrementally increasing from eight hours to ninety-six hours. Grass's mother and step-father were to supervise him while on release. Grass was to seek employment, and his travel time between the hospital and his mother's home and between his mother's home and employment were to be unsupervised. Grass agreed not to engage in aggressive, threatening, abusive, assaultive, or antisocial behavior; not to consume alcohol or non-prescribed drugs; not to frequent any establishment whose primary business was the sale or consumption of alcoholic beverages; not to possess or be in the presence of any weapon; and to submit to random urine drug screenings.

At the hearing held on the petition, Grass offered the testimony of three psychiatrists—Dr. Mario Carrera, Grass's treating psychiatrist from his arrival at St. Louis State Hospital until his transfer to the open ward; Dr. Antonia Gesmundo, Grass's treating psychiatrist following his transfer to the open ward; and Dr. Lori Derosear, medical director and chief of staff at St. Louis State Hospital. Each testified that Grass was diagnosed as suffering from the clinical mental disease of "psychotic disorder not otherwise specified"; however, this mental disease was in remission.[3] Dr. Derosear added that such psychotic disorders are non-recurrent but, if it does reoccur, it will be preceded by the same symptomology of his previous psychotic episode.[4] These psychiatrists further testified Grass was not a threat or dangerous to himself or others; was aware of the nature of the violent crime committed against another person; possessed the capacity to appreciate the criminality of the violent crime against the other person; and had the capacity to conform his conduct to the requirements of the law in the future. Drs. Carrera and Gesmundo conditioned their opinion concerning Grass's dangerousness to others on his complying with the conditions of the release. Dr. Derosear said Grass would benefit from continued psychotherapy.

Psychologist Richard Gowdy, acting Director of Forensic Services for the Department of Mental Health, and Dr. Sam Parwatiker, a psychiatrist hired by the Missouri Department of Mental Health to review release applications, testified for the State. Their views represented the position of the Missouri Director of Mental Health. They opposed the conditional release of Grass based primarily on the information contained in Grass's Form 8113. This form is required to be filled out by treatment teams recommending release of Director of Mental Health patients. The Form 8113s are to contain information relevant to the patient's release. They are submitted to the Director of Mental Health, and the Director decides whether to oppose or support the treatment team's recommendation of release. Drs. Gowdy and Parwatiker asserted the information in Grass's Form 8113 undermines the

3. Grass's experts failed to precisely define the meaning of "remission." Some of the testimony seems to indicate remission means the disease remains but the symptoms are no longer active. Other testimony seems to equate "remission" with cured. At no point in the pleadings or trial did Grass assert he was no longer suffering from a mental disease. Although some discussion of the rights described in *Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) occurred during the hearing, the State has not conceded Grass no longer suffers from a mental illness; therefore, *Foucha* is inapplicable to this case. *See State v. Tooley*, 875 S.W.2d 110, 113–14 (Mo. banc 1994); *Styles v. State*, 877 S.W.2d 113, 115 (Mo. banc 1994).

4. Grass's medical records indicate that for a couple of weeks prior to killing his wife, he was not feeling well and had trouble sleeping. He dieted, lost weight, and became dehydrated because he stopped drinking fluids a couple of days prior to the killing. He also had delusions revolving around religious and spiritual topics.

conclusions made by Grass's psychiatric witnesses.

Drs. Gowdy and Parwatiker stressed the lack of information concerning the cause and nature of Grass's diagnosed psychotic disorder. The treating psychiatrists speculated that Grass's diet, dehydration, and cessation of marijuana smoking just prior to killing his wife contributed to the onset of the psychotic disorder; however, the "trigger" of the disease and the primary stressors causing the disease had not been identified. Drs. Gowdy and Parwatiker testified that unless the nature and causes of the psychotic disorder were identified, no reliably effective treatment plan could be formulated to diminish the potential of future violent acts. Similarly, Grass could not be reliably taught how to recognize a recurrence of a psychotic episode. Even under the current minimal understanding of the disease, Drs. Gowdy and Parwatikar questioned Grass's insight into the nature of the disease and his ability to prevent relapse. Grass had shown questionable beliefs as to the risks posed by his continued marijuana use as well as his understanding of the crime he committed. He refers to the hallucinations that accompanied his psychotic episode and contributed to his commission of murder as "strong thoughts." Grass's records also demonstrated a reluctance on his part to discuss the details of the crime he committed.

Drs. Gowdy and Parwatikar could not express an opinion on whether Grass was a threat to himself or others because such a determination was not possible without more information concerning the causes and nature of his disease. They recommended continued psychiatric therapy to better understand Grass's mental malady.

The trial court found "Grass is not now and is not likely in the reasonable future to commit another violent crime against another person because of his mental illness; and that he is aware of the nature of the violent crime committed against another person and presently possesses the capacity to appreciate the criminality of the violent crime against another person and the capacity to conform his conduct to the requirements of law in the future." The court granted Grass's request for release consistent with the conditions in his petition.[5]

Our review is governed by *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976); *Handy v. Holcomb,* 773 S.W.2d 862, 863 (Mo. App.1989). We will sustain the judgment unless there is no substantial evidence to support it, unless it erroneously declares or applies the law, or unless it is against the weight of the evidence. *Murphy,* 536 S.W.2d at 32. A judgment is set aside as being against the weight of the evidence upon "a firm belief that the decree or judgment is wrong." *Id.*

The authority and procedures for a court to grant a conditional release to a petitioner found not guilty by reason of insanity are contained in § 552.040, RSMo 1994. In applying this statute, it is important to note it is not the legislature's intent to punish persons exonerated from responsibility of a crime due to a mental disease or defect. *Handy,* 773 S.W.2d at 864 (quoting *State v. Hoover,* 719 S.W.2d 812, 816–17 (Mo. App.1986)). Rather, the statute intends to provide liberties to those so confined to the extent the public safety is not threatened. *Id.* Where the crime committed is one of the enumerated offenses demonstrating a particularly grave risk to public safety (such, as here, the crime of murder), the legislature places the burden on the party seeking release "to prove by clear and convincing evidence that the person for whom release is sought is not likely to be dangerous to others while on conditional release." § 552.040.11.

Grass relied on the testimony of the three St. Louis State Hospital psychiatrists to carry his burden of proof. Each of these psychiatrists testified that, in their opinion based on reasonable medical certainty, Grass was not likely to be dangerous to others while on conditional release. These opinions, however, are not dispositive. The determination of whether the evidence satisfies the conditions for release is made by the courts not the treating physicians. *State v. Davee,* 558 S.W.2d 335, 339 n. 3 (Mo.App.

---

**5.** The actual conditional release of Grass has been stayed pending this appeal.

1977). The Supreme Court of the United States has noted the uncertainty of psychiatric sciences: "We have recognized repeatedly the tentativeness of professional judgment. The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment." *Jones v. United States,* 463 U.S. 354, 364 n. 13, 103 S.Ct. 3043, 3050 n. 13, 77 L.Ed.2d 694 (1983) (quotations omitted). Our courts, therefore, are guided by the reasonable legislative judgments concerning the propriety of releases. *Id.* Our legislature has provided six non-exclusive factors the court shall consider in determining if a person should be conditionally released:

(1) *The nature of the offense for which the committed person was committed;*

(2) The person's behavior while confined in a mental health facility;

(3) *The elapsed time between the hearing and the last reported unlawful or dangerous act;*

(4) The nature of the person's proposed release plan;

(5) The presence or absence in the community of family or others willing to take responsibility to help the defendant adhere to the conditions of the release; and

(6) Whether the person has had previous conditional releases without incident.

(Emphasis added).

■ Grass's experts contend he is not a danger to others because he no longer acts psychotic; psychotic disorders do not typically recur; and harm to others upon a relapse could be avoided because Grass would demonstrate psychotic symptoms prior to a violent act and his release could be suspended. These contested opinions and contentions must, however, be measured in the context of the statutory factors. In particular, the legislature requires the determination of dangerousness account for the nature of the offense committed and the time elapsed since the offense. While these factors do not alter Grass's express legislative burden of proving his lack of dangerousness by clear and convincing evidence, the offense of murder demonstrates a mental illness that poses a risk to public safety of the highest order. Conse-

quently, the evidence of the committed's mental condition must be of an equally high order to constitute clear and convincing evidence.

Here, no psychiatric witness was able to offer an opinion as to the cause of Grass's mental illness or the stressors that triggered his tragically violent behavior. While Grass's experts surmised his diet, dehydration, and marijuana withdrawal may have contributed to his behavior, these factors were not characterized as the keys to understanding his mental illness. The insight into the nature of the disease appears limited to the behavior demonstrated in the small but brutal window of time surrounding the slaying of his wife. Grass had not received nor was his disease "controlled" by pharmacological treatment. No evidence indicated his psychotherapy provided any "breakthroughs" to understanding or treating his mental illness. Thus, Grass's experts were not able to provide an explanation for the remission of the psychotic disorder or provide methods to treat the disease or prevent relapse of the violent behavior. Consequently, Grass is equally ignorant of the stressors to avoid and the methods of treatment and prevention. Furthermore, at the time of the hearing, only three years had elapsed since he killed his wife, he had been in the custody of the Director of Mental Health for little more than a year, and he was under observation of his expert witnesses for less than a year. These relatively small lengths of time fail (considering the uncertainties of his disease) to clearly and convincingly support the conclusion his recent non-violent behavior will continue. Assuming the other § 552.040.11 factors remain favorable to Grass, a sufficient amount of time may conceivably pass to support the psychiatrists' opinions Grass is no longer dangerous to others. However, under these circumstances, neither the understanding of the mental disease nor the amount of time that has passed since the offense permits a finding that Grass is not likely to be dangerous to others to the statutorily prescribed degree of persuasion.

In so holding, we perceive a legislative intent not to treat our community as a test tube for psychiatric discovery; clear and con-

vincing certainty of public safety must exist prior to conditional release. Our legislature has determined that those committed for the enumerated dangerous offenses must bear the burden where less certainty exists.

We reverse the order of the circuit court granting Grass conditional release.

CRAHAN, P.J., and CRANDALL, J., concur.